The case this afternoon is No. 06-1602, Honeywell Intl v. Hamilton Sundstran Mr. Krupp Thank you, Your Honor. Good afternoon, Your Honors. May it please the Court, in view of the way that this Court and the Supreme Court has dealt with these issues and past opinions, I would like to begin with the District Court's errors on the foreseeability prong and then move to the tangentiality prong. The District Court erred on the foreseeability prong in several ways, but the way I'd like to focus on is its failure to take into account dispositive admissions by Hamilton Sundstran with respect to the foreseeability of the equivalent at issue. Hamilton Sundstran admitted... Have you read the press release? Yes, Your Honor. So, why isn't this a situation in which guide vanes were known in the general field of the invention before the amendment? The alleged equivalent here is the use of guide vanes, right, for some purpose in the surge control system? Yes, Your Honor. So, why isn't that... Yeah, there was no... Wasn't that known in the general field of the invention? No, Your Honor. There was no prior art use of guide vanes in a surge control system. The closest prior art that Hamilton Sundstran found was the surge control system for the L-1011. It had the measurement of static pressure that they say was equivalent to the APS-3200, but it did not make any use of guide vanes whatsoever. But, Mr. Krupka, this isn't rocket science, to use the vernacular. You're reaching the point where you're trying to check against this potential error to see if you're at a higher low-pressure condition. Isn't it somewhat elemental that one of skill in the art would know? Well, we can just check and see if the vanes are open or not. If they're open, obviously we've got a lot of air coming in, and it's a high-pressure situation. In hindsight, that makes some sense, Your Honor. But the evidence shows and the testimony and the record shows that the L-1011 didn't do it that way. The L-1011 instead measured the flow, and when it went supersonic, it then exercised the shock switch, if you will, to say we're in a high-flow situation and that's the way it goes. And the testimony from the person who was in charge at Honeywell, Mr. Talenowski, said that as of as late as 1985, that was the state of the art, and they saw no reason to make any changes. Where do we find in the record, put aside the L-1011, where do we find a statement that guide vanes were not used in surge control systems in the prior art? Well, I'll ask Mr. Putnam if he can find something from Mr. Mohler to testify that the Hamilton-Sunstrand hasn't pointed you to anything. There was a brief reference in the earlier appeal with respect to the validity issue of a reference, as I recall it, I think it was Warnock, but that was a totally different type of use. I thought there was testimony here by several witnesses that guide vanes were used in the prior art. No, Your Honor. I think what you're remembering, perhaps, is there was testimony that said that people knew that there was a relationship, as Judge Raylors acknowledged, between the opening of the guide vanes and the level of flow through the surge control system. But prior to this invention, no one had used the position of the inlet guide vanes as a way to control the surge control system. And indeed, that was the reason that this court sustained the jury's verdict that these patents were valid. And what the district court did in this case, which we think was clear error, was it said, although the prior art used the measurement of flow and went in one supersonic, then it triggered the surge control shock switch. Because people knew of inlet guide vanes, and they knew that you could tell from the position of the inlet guide vanes whether there was a high flow or low flow situation, it was foreseeable to do this. But that is directly contrary to the evidence that comes from Hamilton Sunstrand itself, when their witness, who was in charge of this program, was on the stand and he said, this was state-of-the-art, and it was state-of-the-art through 1985, and the relevant time period here, of course, is the time of the amendment, which was 82 and 83. So these are certainly not readily known in the art, as the Supreme Court has said the foreseeability standard is focused on. And indeed, it wasn't known at all. There was no use of guide vanes for this purpose in the prior art. The inventions in this case were the first time they did that. Indeed, the evidence also shows that when Hamilton Sunstrand itself went to do this,  But Mr. Kropka, I'm not so sure that the test of foreseeability is whether or not it had been used in the past or not. The idea of foreseeability would be whether one of skill and the art confronting this problem, the problem is we've reached a double solution problem here, I fully agree with you. Okay, well then, wouldn't one of skill and the art say, there's lots of ways we can check to see if we're in a high or a low flow situation. We can maybe put another sensor on there. But wouldn't one of skill and the art say, or we could just check the angle on the vanes. That'll tell us if there's a lot of air coming in. Well, I mean, I understand that in hindsight it seems logical. And I do agree with you that foreseeability doesn't... I'm afraid of hindsight, so that's a good word to throw at me. But why is it hindsight when I'm solving the problem here? Because, Your Honor, the evidence in this case. I mean, I realize looking at it now it all seems rather obvious. As the district court said, you know, we'll lay observer. It seems like, okay, that's an obvious way to do it. But when the parties actually went to do this, it took them a long time to figure out. And the evidence shows that when Hamilton Sunstrand went to do this in 1991, and they realized they had this double solution problem, it took them until 1995 to figure out that we ought to use the inlet guide vane position to determine whether we're on the right side or the left side of the curve. I'm wondering if this is a figure-it-out problem, Mr. Kropke, or it's just a selection of alternatives problem. In other words, there's lots of ways they could have done it. And so maybe for the years that you are citing as an intervening period here, they were just selecting other alternatives. Well, except the evidence doesn't show that. And what I think we're focused back on here is the Supreme Court and this court in its earlier decision in this case. The focus is what was in the mind of the patentee at the time that they were drafting these claims and that they had to make this amendment. And, of course, the amendment at issue here was we rewrote the claim and then canceled the broader claims. So there wasn't any real impetus. There wasn't really any thought given to, well, how can we recast the claims that have already been indicated they'll be allowed to see if we can figure out a different scope to it. They had a specific way of doing it. They wrote the claims that covered it, and they weren't thinking, I'm giving up equivalence to the use of the inlet guide vane. The law's changed on you. That's true. So if we put ourselves back at the issue that we're supposed to be focused on, which is what are the expectations of the patentee at that time? The expectations of the patentee? I would have thought that the public notice function is the expectations of people reading the patent. And I was going to that exactly next, Rob. And I do think the public notice function, and we can get into this with respect to tangentiality as well, is anybody looking at the record of this case will know exactly what happened. And, indeed, Honeywell expressly said in the record exactly what it was doing. Wait, wait. I've got to say I'm confused. My understanding is that at the equivalence trial where you prevailed, that you defined the equivalent very broadly, and it was the use of inlet guide vanes for any purpose in the control of the surge control system, right? Well, there were variations on it, Your Honor, but I think it was the use of it both in the high flow, low flow decision, as well as that it is a, what do you call it, the compressor map is drawn using the inlet guide vane openings as well as temperature, so picking temperature, pressures, flow. Flow was a relevant factor to that. But didn't you argue to the jury that the use of inlet guide vanes for any purpose in the surge control system was an equivalent?  What I argued to the jury was the use that we proved of inlet guide vanes by Hamilton Sundstrand constituted an equivalence and, indeed, in Claim 4, a literal infringement of that claim. But the problem is that they didn't use it for the same purpose as in the patented device or the patented method. The inlet guide vane position was used to establish the set point in the patented device, and it wasn't used that way in the Sundstrom device. So you had to, in order to prevail on the doctrine of equivalence, you had to define the equivalent rather broadly. And the problem for you, it seems to me, is that having defined the equivalent rather broadly and prevailing on the doctrine of equivalence issue, you can't now change and say that we're not going to use that same definition of the equivalent to determine foreseeability. I understand your point, Reiner. And if I might dispute only one aspect of it, and that is what we said was they used inlet guide vanes as well as temperature to set the set point, and they used it in a different way with respect to the surge control, and it was integral and absolutely necessary for the operation of surge control. And what we focused on was the particular use of the inlet guide vanes by Hamilton Sundstrand as the equivalent. But even if you go to the use of inlet guide vanes in a surge control system to operate it efficiently as the broadest explanation that we provided of what the inlet guide vane limitation was, there's still no evidence that that would have been foreseeable, and certainly it wasn't readily known, as the Supreme Court has articulated the standard, to those of skill in the art at the time the amendments were made, which was 82 and 83. And I don't believe the public notice function is disenfranchised in this context because there's no suggestion in the Fowler-Epper history that anyone, Honeywell, the examiner, the prior art that was cited, was focused in any way on inlet guide vanes in any nature, way, shape, or form. All these surge control systems have inlet guide vanes, right? Well, the surge control systems don't, per se, the compressors do that. They have something that controls the flow of air in and through the compressor, and that affects the flow, that affects the temperature. These are all interrelated, and there's a specific map that is done for each compressor, and these interrelationships are known and well known. The only other point I'll make before your honors allow me to move to tangentiality is to note that there is evidence of copying in this case, and there was willful infringement found. So we're not talking about someone who just happened to be in the scope of this. There is evidence that their engineers, as well as their lawyers, were studying the patents in suit, as well as our own devices. So I don't think we're dealing with an inappropriate use of doctrine of equivalence or non-textual infringement in this case. I think the way that this comes out, it does protect both the patentee's expectations as well as the public notice function. Now, if I can move to tangentiality, and I recognize that recent decisions have focused on this and explained what a narrow exception this is, and we respect that. And also, we've said that if the reason for the amendment is unexplained, you can't take advantage of tangentiality. That's correct, your honor, and I don't disagree with that. Now, there's two points that I'd like to make in response to that observation. First is, we did explain in this case why we were making the amendment. It's specifically set forth in the file record of history very expressly that we were making these amendments in order to comply with the examiner's instructions. Now, if I look at the other cases, there's three cases now that have found tangentiality. And in each of those cases, the court has said, there was an explanation of what the reason for the amendment was. But interestingly, in in situ form and in the recent case of Aquitax, that reason focused on a different aspect of the invention and the amendment that was at issue in the case with respect to doctrine of equivalence, the number of cups in the in situ form case, and the nature of the fiber fill, if you will, in the Aquitax case. There was no discussion of that in the file record at all. So if you can accept my analogy, in this case, we explained why we were making the amendment. But the doctrine of equivalence focuses on a limitation that was, if you will, added because of the cancellation of the broader claim. That was not talked about in specific, and that puts it in exactly the same situation as in situ form and Aquitax. There was no reference specifically to that limitation. Any more there was the other limitations that didn't involve inlet guide vanes for the other claims of the patents in situ that were objected to and allowed when rewritten in independent form. So we have a situation here where there was an explanation of why it was. The public notice function is preserved. There's no question in anybody's mind when they read this record exactly what happened and why. But there's also no expectation that anybody was specifically focused in on the inlet guide vane limitation as the reason for the amendment or that someone carefully parsed the inlet guide vane limitation in a way to capture either a broader range of equivalents or whatever. There was just no discussion of it. It's clear that the patentee didn't even have it in their mind. So I think under those circumstances, we believe that tangentialness does apply in this case. I recognize that it's a narrow exception, but I think this is one of those cases where given the three cases that this court has found tangentialness, this should be the fourth because I think it falls in the same rate. I realize my time is now up, and the only comment that I'll make on the damages issue before sitting down is the district court made a $373 million mistake with respect to the marking and damages issues in this case, which is not only important to these litigants but the entire manufacturing community. And I hope we get to it. Thank you, Your Honor. Okay. Thank you, Mr. Kropka. We'll give you some rebuttal time as well. Mr. Levine. May it please the court, afternoon. Mr. Kropka said during his argument that there was no prior use of inlet guide vanes in surge control systems. That is incorrect. I will give you citations. Glenn patents, which is from 1979, figure 4, A32415, that figure shows the use of inlet guide vanes as an input in a surge control system. I think what Mr. Kropka is saying, in fairness to him, is that he agrees that inlet guide vanes were used in surge control systems. What he's saying, as I understand it, is that there's no evidence that inlet guide vanes were used to control the surge control system. And I believe that's incorrect because I'll give you another citation. Honeywell's corporate representative, Mr. Clark, an engineer at Honeywell, testified at page A60019, starting on page 89 of the deposition, that he was asked if it made sense to use inlet guide vanes as an input. And he said, yeah, you want to take advantage of it. He said that's a principle he knew of when he started working at Honeywell in the late 1970s. That's before 1982. I don't know exactly what's meant by the phrase, to control surge control. I mean, surge control is a, you're trying to control surge. There are different inputs that are used in that. Honeywell's patents, the claims, each of them talks about using inlet guide vane position as an input in a surge control system. And Honeywell's own corporate representative said that's something that was known back in the 1970s. And this brings me... What's the page reference for that again? It's A60019. And the pages within that that are cited are 89 lines 1 through 16. He also said later on at 60059, toward the bottom, it's 365 line 17, that prior to 1983, going back in the 70s, he understood that in order to efficiently control surge, you'd need to take into account inlet guide vane angle and input it into your surge control system. And that's going on to the top of A60060. Mr. Muller, who was Honeywell's expert, admitted the same thing at pages A50541 to 42. And what that takes me to is something that Judge Dyke suggested with the questioning, which is that Honeywell can't have the definition of the equivalent one way, when it wants to convince the jury of something for infringement purposes, than a different way when it comes to looking at foreseeability on remand. And what we look at here as to how it is that Honeywell defined the equivalent is what they said in their appellate briefs the last time around, after the infringement opinion came up, which this court incorporated into the en banc opinion. And what this court said was that Honeywell argued the function of the inlet guide vane limitation is to incorporate the position of the inlet guide vanes into the surge control system. It argues the function is met because the APS3200 uses inlet guide vane position in addition to temperature to efficiently control surge. And that's 370F31136x37. That precise language, and it's not a coincidence when we depose their corporate representative, but that precise language is what their own corporate representative said he knew about back when it was known in the industry, or known at Honeywell at least, back in the 1970s. Efficiently controlling surge with inlet guide vane position, and incorporating the position of inlet guide vanes into the surge control system. But these are the inventors. These are the people who did finally make that change. We're looking for the people that are of ordinary skill in the art, and what they might have foreseen at the time of the amendments. And these are also, if you look at the statements, I've just looked at them as you've commented, they're talking about the principle that guide vane angle is going to have some kind of effect on surge. That principle is not the question. The question is whether one would have looked to that particular principle to solve the problem of surge. Let me address each of those points. Yes, please do. As to the first one, Mr. Clark was not an inventor. He was just an engineer at Honeywell. And it's not just Mr. Clark who said that. But he's at Honeywell, so he's part of the team that's working on the problem. Where's the commentary from your people? Well, the commentary, let me... Saying that this was one of the alternatives, we'd always thought of this as alternative. We just had tried other ways first. The commentary is from the experts. The testimony is from the experts. From both our expert, Mr. Gepikse, and Dr. Gepikse, Honeywell's expert, Mr. Muller. Mr. Muller testified that the use of inlet guide vanes to efficiently control surge was known back in the 70s at page A50541-42. Dr. Gepikse testified to the same effect at page A50595-96. So we have testimony from the two experts and from Honeywell's corporate representative, who's an engineer, about what was known. I'll just note, not only did Mr. Clark happen to be an engineer, he was Honeywell's corporate representative. So what he says is binding upon Honeywell. Now, as to... I'm trying to remember what your second point was, not how you addressed your first. I apologize. Well, I'm wondering where the evidence comes from the person of ordinary skill in the art, particularly your representatives. If you look... Give me one second to turn to this. The question to our expert, this is at 505... Why did it take you so long, by the way, to come to this solution? It didn't take so long. You... Let me just address... Let me finish my answer to your earlier question. A50595-96, Dr. Gepikse said, starting at 248 line 22, he was asked if he has an opinion about whether the use of inlet guide vane position in a surge control system was foreseeable to a person of ordinary skill in the art in 1982, and he said it was. And then he explains that in the testimony around that. So that answers your first question. Second, as to... One additional point on that, and this is important, is their own corporate representative, Mr. Clark, said that had this problem come up in the 1970s to Honeywell... In other words, had they seen the double solution issue, which is something more specific than what we need to show in order to show foreseeability. We just need to show the use of inlet guide vanes to efficiently control surge, which is how Honeywell defined it to this court in the first go-round. But in that testimony, Mr. Clark said at A60035-36, that had this issue come up in the 1970s, had the double solution issue come up, Honeywell would have solved it the same way they solved it in the mid to late 1980s, which is using inlet guide vane position. Now, as to your question, why did it take so long? It didn't take so long. Mr. Krupka asserted that it took four years to use IGV position. That is not correct. The record shows, the record evidence shows that on October 1st, 1991, Hamilton Sunstrand's engineer, at that time it was just Sunstrand's engineer, Pete Suttie, noticed this double solution issue. He then sent a memo on that date, which is A33284, to our partner working on this program, Turbomeca. About two and a half months later, Turbomeca sent a memo back saying, here's the solution we developed, which is a test that uses several inputs, which included, as one of the inputs, inlet guide vane position. And that's A33291. It wasn't until a few years later that the test was finalized, not because they were having a problem with the use of inlet guide vane position. That stayed in the test throughout. They were having a problem with a different input that they were using, which was the load compressor discharge temperature sensor, which was ultimately eliminated from the test in 1994 as reflected at A33513. Now, if I could turn to tangential relation. The reason for the amendment that Mr. Kropka offers is, and they say this in the reply in pages 2, 6, and 12, to respond to the examiner's rejection, to do what the examiner told it to do, and to follow the court's direction. I submit that if that were the reason, if that were allowed to be the reason, then it would gut the tangential relation exception. It would gut, actually gut the FESSO presumption. It would make the exception so broad that it would swallow up the rule. And the reason is, and that would be contrary to what this court said in the cross-medical decision earlier this year, the tangential relation criteria is very narrow. In every case, you're trying to get allowance. In every case, you're responding to the examiner's rejection. And certainly in every case like this one, which was decided en banc, rewriting a dependent claim into independent form, because the examiner said it's allowable if you do so, every single time you'd be doing what the examiner told you to do. So is your view of, and this is a more general philosophical question, is your view of the way precedent has evolved, and particularly what the Supreme Court said about the doctrine of equivalence, that the patentee should have, had he thought of it, been able to claim based on the specification that he had the subject matter, which is no longer literally claimed, or that the patentee should have and could have written a different specification to provide support for that subject matter? I'm not sure offhand of what the precedent is on what's in the specification. The precedent here in this case, and this was my point, in this very opinion, the en banc precedent is that when you rewrite the dependent claim in independent form following what the examiner said you're going to do, that is estoppel under FESTA. Provided or not that there was support in the specification for a claim sufficiently broad to embrace at least the accused structure. I'm not sure about that. No, neither am I. But these questions do arise particularly here, don't they? When the reason for the amendment was because the examiner said you make the change, I'll allow the claim. And as you know, that's quite a common practice, or at least it used to be. I think it won't be anymore. Certainly, right now, if what you want to do is be able to show tangentiality, you have to say something. You have to say, well, the reason I'm doing it is because of change A rather than change B. And then when you get into a lawsuit, if the issue is about change B, you could say that's tangential because we said the reason was change A. And I realize that this doctrine developed after the patent here was applied for and after the changes were made. But this court's rule, that's not really the point. In other words, it's applied retroactively. The other point I want to make about tangential relation is this court's opinions are uniform, that silence in the record can't be the reason. This is in Festo, Biagro, and Cross Medical all make that point. I think Judge Rader made the point quite well in the concurring opinion, the separate concurring opinion in Cross Medical, where he said evidence of tangentiality must appear in the prosecution history in order to prevent litigation-driven or hindsight reconstruction of the reasons for an amendment. That is, silence when there is more likely than not an obligation not to be silent. But other than that, that's a very sweeping generalization. That something you don't talk about in the prosecution history will be presumed adverse. Well, here's the problem. And the problem is there is a presumption, actually. And the presumption is that you've given it up. That's the presumption under Festo. On the theory that otherwise there would be an obligation to say something. And here, Honeywell could have said something. Not whether they could have, whether they had to or should have. Well, that's not the test, though. Under the Supreme Court opinion in Festo, the test isn't whether or not they— The court didn't say. I'm sorry. The court didn't say. What the court said was that you were looking at the ability or the patentee's ability to write the language to come up with something that is more limiting. And here, Honeywell, instead of having the claims limited to use of IGV position to affect the set point, which is, broadly speaking, what's in the three claims at issue here, Honeywell could have just said, in the claim, the use of IGV position to efficiently control search, which is what they said was the equivalent. And that was really the first question I asked you. And I don't really want to divert your argument. But you're saying that even if Honeywell could not have supported such a claim with the specification that they started with, they had an obligation to obtain it? They lose it for lack of enablement. The answer is that's not the case here. The reason is they did have support in the specification. Because if you have support for a very specific system, one that controls the set point, then by definition there's support for a claim that is somewhat broader, which is using IGV position as an input without specifying whether or not it's for controlling the set point or some other reason. That gives you the support, but it just is a broader claim than what you ended up with here, which is affecting the set point. Could you just briefly characterize what you think the state of our law is with regard to marking when you have both a method and an apparatus? Good question. The state of the law is that there's no law that I think is exactly on point to this case. There's no question that if you have only a method patent at issue and nothing else. That's easy. Yeah, that's the easy one. But here I think the closest case, and I readily admit that we're somewhere in between devices for medicine on the one hand and possibly crystal semiconductor on the other. I would submit that we are closer to devices for medicine because you had there both apparatus and method patents. I think that you have two key factors here that put you closer to the devices of medicine side of things. Number one, you have the interrelationship between the patents. You have the patents both coming out of the same specification with the same inventors, the same examiner, the same figures. That's something you didn't have in crystal semiconductor. Number two, here you have, at least in this case, where the claimed method is the use of the product as in devices for medicine. It doesn't necessarily have to be the case, but at least you have that overlap between the two patents. And in this case, that overlap is one where Honeywell admitted, response to request for admission, that its products that are out there practice both the method and the apparatus claims. That's all I have. Thank you very much. With respect to this debate on foreseeability, I think we need to put ourselves back in the proper perspective, which is we're dealing with the equivalent at issue. I know there's some dispute about how we define the equivalent. But I don't think there's any dispute that at the trial, at this court the last time we were here, and now, that equivalent at least includes the high flow logic issue, which required the recognition of the double solution problem for the measurement of static pressure. So we're dealing with the use of inlet guide vanes in that context. And there is no evidence that that was ever recognized before. So that's exactly what Festa rejected. It's not foreseeability in connection with the amendment. It's foreseeability before the amendment. I agree. And before the amendment, as Hamilton Sunstrand admits, the closest they could come to with a surge control system was the L-1011, which made no use whatsoever of inlet guide vanes. It chose to solve that double solution problem a totally different way. And although now with hindsight we can look back and say, well, you could have done it a different way then. And you can ask Mr. Clark on behalf of Honeywell, if you had looked at this problem and would you have been able to make the invention years earlier? His answer was, we could have done it then the same way. There was no impediment that would have kept us from doing it in the 1970s, just like we did in the 1980s when we made the invention. The test can't be, could you have not made the invention earlier? He said they could make the invention earlier. There's no reason to suggest that he wouldn't. Now, in response to Judge Dyke's question earlier with respect to no use of inlet guide vane like the one in the APS 3200, I might refer you to A50537, which is Mueller, our witness's, our expert's direct testimony. A50535, no evidence of use of IGV position like the APS 3200. And Mr. Japitzky, Hamilton Sunstrand's expert at A50612. And Judge Dyke, in completeness with respect to the doctrine of equivalence issue with regard, I know you would ask me about it a little bit earlier today and I know this was a subject on your mind at the earlier appeal. And one reference I didn't make at that time, but I will respond to your question today with it, is in the earlier appendix, the appendix from the earlier appeal, A16216, which is where Mr. Mueller testifies about that even in the normal low flow situation, there was a reference there. Oh, I'm sorry, Your Honor, the first site that I gave you, Mr. Putnam's handwriting was, it should be A50534, not 50537. I apologize. Now, with respect to Mr. Levine's answer to you, Judge Rader, with respect to why did it take so long, if you look at Suttee's declaration at A50428 and 29, he explains the whole thing. It's right there in his declaration in this record. And although they may have suggested that the inlet guide vane might be a way to help solve this double solution problem, it took them four years to figure out how to do it in the way that ultimately ended up being put in the APS3200 and that was the equivalent in this case. So I submit, although somebody came up with the idea that maybe we can use inlet guide vanes some way, it took them four years or five years, depending on whether you count 91 to 95 as four or five years, to get it done. And it's right there in the record in Suttee's declaration. Now, with respect to the tangentialness issue, Judge Newman, of course, the specification limits what you can include in the claims that you present to the PTO. So that's, I think, the answer to the question that you asked. The other aspect of that is there was no real opportunity or motivation for the patentee at this time when he was told that if you rewrite these in independent form, they will be allowed to explain any further what was going on. And I think as much as we want to preserve the public notice function and we want to constrain the protective doctrine of equivalence application to the right circumstances, I submit here is one because we have a copier who has been found to willfully infringe. At the same time, I think we need to protect the patentee's expectations, and there's a balancing that needs to be done here. And I don't really think the patentee had any reason to believe that by doing what the patentee did in this case, all equivalence with respect to either the inlet guide vane limitation or the change in error signal limitation of one of the other independent claims that was altered, one of the other dependent claims that was rewritten and ultimately allowed, or the temporary deactivation of integral controller claims, was totally given up. And if there are no more questions. Give me the same assessment. When you've got the method and apparatus claims, what's the marking obligation? I think in the situation where it's clear whether claims are in both in the same patent, and in the cases that this court has decided already, where the method is the use of the apparatus, then it's fair to say that the apparatus ought to be marked because it's the use of the apparatus that is the method it follows. I think here, where it's clear that you can practice the method without regard to the underlying apparatus, and where you have the patent trademark office saying that these were materially different and distinct patents or inventions requiring the separation into two separate patents, and you could, for example, practice Claim 4 of the 194 patent by adjusting the relationship between the magnitudes of the integral and proportional control signals and the magnitudes of the parameter variations as the function of the inlet guide vanes, but, apropos your point, Judge Dyke, not using it as any way to adjust the set point. So you could practice the apparatus, or you could use the apparatus without practicing the method invention, and you could practice the method without any regard to the particular apparatus of claim. So, therefore, it would be particularly perverse to require marking associated with the method claims in this, because it would actually be misleading to suggest that the only way you can practice the method is to use this apparatus. In the other cases where there was a marking requirement where you had both, it was because it was either the use of the method to make the product, or it was the method was the use of the product. I think in the medical device case it was the insertion of the product into the body. So I think that's the state of the law, and that makes sense. I think it doesn't make any sense to apply it in this case. Any more questions? Thank you very much for your attention. Thank you both.